**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

   **v.**

              **Criminal Case No. 24-CR-235 (ABJ)**

**GUSTAV SEESTEDT,**
      **Defendant.**

---

**NOTICE OF FILING OF VICTIM IMPACT STATEMENT**

   Minor Victim 1 (or "MV-1"), through undersigned counsel, files the attached "Victim Impact Statement" pursuant to 18 U.S.C. § 3771. [1]

Date: July 2, 2026

                   Respectfully submitted,

                   */s/ Blair Decker*
                   Blair Decker, D.C. Bar No. 1023014
                   Shalin Nohria, D.C. Bar No. 1644392
                   Melissa Skarjune, D.C. Bar No. 90030103
                   Hogan Lovells US LLP
                   555 13th St. NW
                   Washington, DC 20004
                   Tel: 202-637-5600
                   blair.decker@hoganlovells.com
                   shalin.nohria@hoganlovells.com
                   melissa.skarjune@hoganlovells.com

                   *Counsel for Minor Victim 1*

---

[1] Minor Victim 1 does not seek to have the attached Victim Impact Statement filed under seal and consents to its inclusion on the public docket without redactions.

**VICTIM IMPACT STATEMENT**

Your Honor,

Thank you for your time and consideration of my statement. My name is Claire Lanman, and until now I have only been identified as "Minor Victim 1", or the defendant's "teenage ex-girlfriend" in court records in this case. For the past 21 months I have existed as a silent party to this case, patiently waiting for my opportunity to be reasonably heard. I have spent many months ruminating over my past experiences with the defendant, the crimes he committed against me, the impact they have had on my life, and how I could convey that impact for the consideration of this court at sentencing.

I never wanted to be "Minor Victim 1". While I spent nearly 20 years of my life in denial of my past experiences, I am now painfully aware that I am a victim of the defendant, that I wasn't the first, and I wouldn't be the last. In light of his more recent offenses, I felt compelled to come forward and provide the Government with a more accurate picture of the defendant. I had hoped that the totality of the defendant's crimes, his predatory characteristics, and his propensity for harm would be considered by the Court in determining the appropriate sentence. I am greatly concerned that the plea agreement reached between the Government and Defense counsel does not sufficiently serve justice for the crimes he has committed. I hope that the Court will reject the proposed plea agreement as too restrictive and the parties will either reach a new plea deal that allows Your Honor to decide the appropriate sentence based on all of the information available or the case goes to trial.

Exactly two years ago, on June 30, 2024, I received a text message from my sister-in-law informing me of the defendant's arrest. What began as an ordinary Sunday morning for me, standing in my living room with my best friend, became the day that permanently altered the course of my life. As I read the details of the defendant's crime, the video he shared with an

1

undercover officer depicting the forcible rape of a toddler victim, I experienced the first and only panic attack of my life thus far. My hands began to shake and I dropped my phone, and as my body fell limp and I struggled to breathe, my best friend moved me to the couch and instructed me to put my head between my legs and breathe deeply. In between breaths, the only thing I could say was, "Oh my god. *I was a child.* I was just a kid." I was not shocked by what the defendant did, because a part of me always knew he was capable of doing something like this. I have spent most of my life largely dissociated from my body. In that moment my body was overriding this dissociation, signaling alarms to the trauma it had been carrying this whole time. In that moment, I knew I would be forced to face the reality of my past traumas, a reality I have spent my entire adult life running from.

In the fall of 2003 I entered the 7th grade at a school that ran from grade 7 to 12, where the defendant was a high school senior. Before he graduated, the defendant was one of the most popular guys in school. He was handsome, charming and funny. He was a big personality, always making people laugh and drawing attention to himself. He was flirtatious and had a reputation for dating many girls, often younger. I, on the other hand, was coming from a home where I felt misunderstood and emotionally neglected while dealing with the normal stressors of girlhood and puberty. It is because of these issues that I wanted to attend this school, where my older brother attended for his special education needs. I had hoped to receive the same support and individualized care as my brother. The irony is that my attendance at this school led me to cross paths with the defendant, and the issues that brought me there left me so vulnerable to his predation.

I did not interact much with the defendant in school, though I was aware of him and his reputation. The defendant would later tell me it was during this time that he first developed an

2

interest in me, when I was only 12 years old. In my first year of school I learned that the defendant had sexual contact with Minor Victim 2 ("MV-2"), a girl in my grade who was 13 years old at the time. I saw that MV-2 was largely blamed and shamed for what happened to her. There was an understanding that the defendant was a man with very little impulse control for his sexual urges, and it was the responsibility of young girls to avoid indulging him. Over the course of my 8th grade year I became best friends with MV-2. In the summer of 2005, MV-2 introduced me to the defendant. I had just turned 14 years old, the defendant was 19 years old.

The details of these early interactions with the defendant are laid out in the Statement of Offense. That first night in the defendant's home was the first time I smoked marijuana, the first time I had been kissed, and the first time I had sexual interactions of any kind. While those experiences were unsettling and strange to me, my lack of sexual experience led me to believe this was a normal part of teenage sexual exploration. There was a level of excitement and validation I felt from his attention.

In the fall of 2005, MV-2 left the city to attend boarding school, and I began meeting with the defendant individually. The defendant offered me a position at the CD store where he worked, and the job provided us with more time to spend together without my parents' knowledge. When the defendant began pursuing me romantically, I felt chosen and special. It was a feeling I wasn't getting at home or in school, and I continued to chase that feeling, not knowing it would be much to my detriment. As a child who had just lost her closest friend, who was gaining independence and growing more distant from her family, I was desperately seeking belonging, validation and attention. It is clear to me now that the defendant didn't choose me because I was beautiful, or special, or more mature than my peers, as he led me to believe at the time. He chose me because he saw these vulnerabilities and saw that I made the perfect victim.

3

The defendant and I carried on our so-called "relationship" in secret, knowing that our age difference made it illegal. While the defendant's family was aware of what was happening, they were greatly concerned about the legal repercussions he could face if this ever came to light. The defendant has always been fiercely protected by his family, and I knew that if anything ever happened to him that I would be held to blame for it, and there could be great consequences for me. Despite his family's objections, the defendant told me I was "worth the risk". He knew that as long as he had my loyalty and devotion, there was never any risk to him at all.

My parents were not made aware of this so-called "relationship" until I turned 16 years old and I introduced the defendant to them as my boyfriend. My parents were easily charmed by the defendant and saw no reason to be concerned for my safety.  Since I was a young child, my parents have always seen me as a wise and "old soul." They saw that I was fiercely independent at 16 years old, and they believed I was mature enough to handle a relationship with a man five years older than me. Had my parents known that for years I was routinely sneaking out of their house to meet with the defendant, had they known what was happening on those many nights, they never would have approved. I know that with the facts of this case coming to light, my parents now deeply regret not stepping in to protect me from the defendant. Even with the defendant's arrest, it took some time for them to understand this was not just a case of a man I once dated going on to do terrible things. This led to a deep fracture in our family that we are still working to repair. I can understand why my parents made these hurtful assumptions, as I have seen counsel for both the Government and Defense repeatedly refer to this as a "romantic relationship". I now understand that if this had ever been a legitimate relationship, it wouldn't be the source of bragging rights for a pedophile in a telegram chat. I now understand that the defendant recorded our sexual acts to have "trophies" of his child sexual abuse. He shared these

4

"trophies" with strangers on the internet and took pleasure in recalling my abuse and further victimizing me. I hope that your Honor can see what I see, that this is in fact a case of prolonged child sexual abuse.

This form of abuse is so insidious because from the outside and to the victim it appears to be a romantic relationship. In fact, the only evidence of this being a romantic relationship exists in my personal diaries from the time. These diaries contain the words of a child with a malleable mind, whose understanding of love had been shaped by years of grooming and manipulation tactics employed by the defendant. I provided these diaries to the Government to help establish a timeline and details for the crimes committed.

Throughout the years with the defendant, I would find sexually explicit photos and texts from other teenage girls in his phone. When I would confront him about the texts he stonewalled me, staring at the floor and refusing to speak. Then he would cry and tell me that he had a problem, that he couldn't control himself, that he loved me and he never meant to hurt me. After one such confrontation, the defendant got on one knee and told me he wanted to marry me someday. He taught me that if I could endure these betrayals and remain faithful, I could earn the love of the defendant. I thought that if I could just keep the defendant sexually satisfied, I could earn his fidelity. I spent every waking moment I could with him, knowing that in my absence he would seek out other teenage girls to have sex with. My life became engulfed by the defendant and his sexual needs, but it was never enough for him.

The defendant was aware of his "problem" well before he ever met me, and he has been aware of it for all these years. This show of remorse he put on for me, that I'm sure your Honor has seen many times in this courtroom, is not for the harm he has caused. He has seen the harm he caused me for many years and remained relentless in his abuse. He has played upon the

5

empathy of the people who have loved him, while secretly taking pleasure in the humiliation he has caused them. When faced with accountability, the defendant has made himself the victim instead of accepting his responsibility as the perpetrator.

By the time I graduated high school, I had no close friends my own age. Even when MV-2 returned from boarding school, the defendant used me to lure her back into sexual interactions with him. This ultimately led to the dissolution of my friendship with MV-2, and I have carried the guilt of that for many years. The few other close friends I had in school saw the defendant for what he was, a predatory older man. They saw my loyalty to the defendant as a lack of self-respect, and so I distanced myself from them. For the most part, my relationship with the defendant afforded me a social status I felt I couldn't achieve on my own. When I first started school, I was so shy and socially awkward that kids in my grade called me "the mute". Being the girlfriend of the man who had been so popular at our school allowed me to navigate the difficulties of high school social life with a level of confidence I never had. My identity was so wrapped up in my relation to the defendant, I couldn't see myself without it.

After graduating high school, I deferred my college entry to spend a year living with the defendant in a group house with his family and friends. During this time I was prone to depressive episodes, spending days unable to get out of bed. I began drinking heavily with the other adults living in the house, and I was prone to blackouts and emotional outbursts. The defendant became resentful of me and the burden I placed upon his life. I was no longer his perfect teenage victim, I was a traumatized adult taking up space in his room. Once again, the defendant made himself the victim of the pain he had caused me. For most of my adult life I have abused alcohol and substances to cope with the pain of my past. Through this process of facing my past I have been able to understand the source of my alcohol and substance abuse and finally

achieve sobriety. I understood that if I persisted in trying to numb away my reality in this way, it could ultimately lead to my death.

It has been said that this so-called "relationship" ended when I left for college, but that's not entirely true. In the fall of 2011 I left for school with the understanding that we would maintain a long-distance connection. The defendant led me to believe he still loved me and wanted to marry me someday, and after I returned from school we would live together again. The defendant saw me leaving for school as an opportunity to finally dispose of me. He immediately began distancing himself from me, and I learned that the very night I left he went out to a bar and exchanged numbers with a female bartender. The idea of losing the identity I had built around the defendant was extremely distressing to me, and I fell deeper into depression. After one semester of school I dropped out and returned home, hoping to repair a relationship that I thought had been fractured by distance. It is only after I sacrificed my education that the defendant informed me he had started a new relationship. He told me it "must be nice" to be able to frivolously throw away my college education, as he did not have the financial means to do so. Once again, in the face of my pain and heartbreak, the defendant managed to position himself as the victim.

After I left my home of Washington DC and attempted to start a new life, the defendant continued contacting me to solicit nude photos of me. Because my understanding of love was so intertwined with sexual exploitation, I took it to mean he was still in love with me and I obliged his requests. The defendant then informed me he posted a nude photo of me on craigslist without my consent, soliciting strangers to have sex with his "teenage girlfriend". I begged him to take the material down, but when he refused, I spent hours scouring the backpages of craigslist to find the post and have it removed until he finally relented. The degradation and abuse I experienced

for so many years led me to believe that I deserved this treatment, and that it was unique to me. I felt powerless to stop it; I accepted that this online abuse would likely continue and I tried to live in denial. I had hoped the defendant would eventually move on and settle into his new relationship, forgetting me as I tried to forget him. The defendant's relentless online abuse has ensured that I will never forget him. For me, there will never be a day that I get to know that the videos of my abuse are not accessible online or in the possession of strangers.

As a person I have always been disposable to the defendant, but as an object he could repeatedly exploit for his own sexual pleasure, I have been a prized possession. I have existed for decades on a portable hard drive as nothing more than a series of files, among 1,619 video files and 987 images of child sexual abuse material. I have read the horrifying details of only a handful of these video files, and I can only imagine the suffering of these victims.  These victims are unaware that they have existed in this space with me, and they cannot speak to their experiences. It is not only for myself, but for these many child victims that I have finally come forward to share my experiences and speak the truth about the defendant, to seek justice for us all.

My involvement in this case has come at no small cost to me. For the past two years I have been forced to recall traumas from my past and consider the impact they have had on my life. This has taken a severe toll on my mental and physical health and has impacted my personal and professional life.  I have been diagnosed with Complex PTSD, and the symptoms I suffered with for many years have only been exacerbated by this legal process. I have suffered from insomnia as I ruminated over the past and experienced feelings of shame and worthlessness. When I first wrote this victim impact statement, I was told by my doctor that I had lost 26 pounds since the beginning of this case due to stress and lack of appetite. At a recent doctor's

8

appointment, I learned that my weight loss was now up to 37 pounds. I became hypervigilant in my relationships as I lost trust in people. I became estranged from my family and isolated from my community. As I looked back at my past abuse, I blamed myself for not seeing it at the time. I lost trust in my ability to discern danger in people and protect myself from it. Intimacy, love and connection should be the best parts of life, but for me they are the things that I fear most.

As I saw my life falling apart, I became reclusive as I wanted to hide it from friends and family. I spent months in a dissociative fog, losing hours, days and weeks of time as I tried to cope with the reality of my situation. If it had not been for this reckoning, I may never have come to terms with my past and seen how it was actively harming my present. I can truly say that this entire process has destroyed the life I knew, but I can see now it was a life that needed destroying. For many years I have carried the shame and suffered the consequences of the defendant's actions, but it was never mine to carry.

Many victims of abuse refer to themselves as survivors, but I have been reluctant to do so, as I did not know if I would survive this process. Suicidal ideation is a voice that has lived in my head for most of my life, a voice that I have to work every day to keep silent. There were times throughout this process that this voice became so loud, it was like the background noise of my everyday life.

According to the CDC, survivors of child sexual abuse are two to thirteen times more likely to experience sexual revictimization in adulthood[1]. That is a statistic I have also fallen into. My experiences with the defendant not only made it more statistically likely to happen, but they ensured that when I encountered that moment of sexual violence, I wouldn't understand it for what it was. I would be able to trust and care for my rapist, and afterwards I would comfort

---

[1] https://cdc.gov/child-abuse-neglect/about/about-child-sexual-abuse.html.

him, because I understood that he was just another man like the defendant who couldn't control his impulses. Years later when I would call a rape crisis center, I wouldn't even be able to answer the first question, "Have you been a victim of sexual violence?". Sexual violence is what I grew up understanding sex to be. My sexuality was born into abuse; my identity was supplanted by the defendant's fantasy. The most devastating and lasting impact of the defendant's abuse has been the loss of my identity. I have had to mourn the loss of the girl I was before the abuse, and I'll never know what life she could have lived if it had never happened.

While the Government asserts that this plea agreement was reached with consultation from myself and my counsel, I would like to convey my experience of this consultation. Through my communications with the Government, I understood that a likely outcome of this case would be a plea agreement in which the defendant would plead guilty to the lead charge, and the Court would have discretion to determine an appropriate sentence within the sentencing guidelines. In the months leading up to the plea agreement there was no indication from the Government that this disposition had changed. On July 23, 2025, I received an email informing me that the Government intended to offer a plea deal to the defendant, binding the court to sentence him to 15 years, the mandatory minimum for Sexual Exploitation of a Child. In this email I was also told that I was welcome to attend the plea hearing, but I would not be permitted to speak. The next morning, I responded to the email and requested a meeting to discuss my concerns with the proposed plea agreement. That same day, the plea offer was sent to defense counsel, and my brief window of opportunity to express my objections and concerns had closed.  It is only after the plea was sent to defense counsel that I sought additional advice and understood that I did have the right to be heard at the plea hearing. To be clear, I understood this at the time of the plea hearing and chose not to speak.

10

It is only through the tireless and exceptional work of my counsel that I was able to file a motion objecting to this plea agreement and ensure that Your Honor heard all of my concerns before deciding on whether to accept the plea agreement.  I am eternally grateful to them for helping me to make my voice heard in a process that often keeps victims in silence. I hope that Your Honor rejects this plea agreement and the parties reach a new plea deal that allows you to decide the appropriate sentence or the case goes to trial. Regardless of how Your Honor rules, I hope that my words will impact the way the court views cases like this, and the way the Government works with victims like me in the future. I hope that the Government will understand that teenage victims are still children, incapable of understanding their own sexual exploitation. While this is not the kind of case that is commonly seen before this Court, it is a common experience for so many young women and girls. I hope that by sharing my story that other victims like me will know they are not alone. I hope that they will see that they are not meant to carry shame and blame themselves for the actions of an adult man. I hope that they will not feel obligated to explain the dynamics of abusive relationships that keep them trapped with their perpetrators for many years. I hope that in the future they will not feel obligated to lay themselves bare before the court in order to prove themselves worthy of justice.  Thank you for your time.

11